Filed 8/21/13

**CERTIFIED FOR PARTIAL PUBLICATION***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054882 |
| v. | (Super.Ct.No. RIF105398) |
| ENRIQUE ORTEGA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Thomas E. Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Kevin Vienna and Heidi T. Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Around 1993, when his daughter was about nine years old, defendant Enrique Ortega started groping her breasts and vaginal area. In 1996, when she was 12 years old, she made a partial disclosure to her mother, stating only that defendant had touched her breast once. As a result, her mother made defendant move out of the house. In 1999, when his daughter was 15 years old, defendant moved back in and started groping her again. In 2002, when she was 18 years old, defendant left the family to live with another woman. At that point, his daughter finally disclosed the full scope of the molestation.

In 2003, defendant was charged with nine counts of a nonforcible lewd act on a child under 14 (Pen. Code, § 288, subd. (a)) and 13 counts of a lewd act on a child under 16 (Pen. Code, § 288, subd. (c)(1)). He fled the country. In 2010, he was located and extradited. In 2011, his trial on these charges resulted in a hung jury.

The prosecution then filed an amended information charging defendant with six counts of a nonforcible lewd act on a child under 14 and six counts of a lewd act on a child under 16. In defendant's second trial, the jury found him guilty as charged. He was sentenced to a total of 16 years in prison, plus the usual fines and fees.

Defendant now contends (among other things) that, with respect to the six counts of a lewd act on a child under 14, the statute of limitations had run. In the published portion of this opinion, we will hold that, as a matter of law, the statute of limitations had

2

not run, because the evidence showed that the molestations continued to occur at least once a week throughout 1995, and because the limitations period, initially six years, was extended to 10 years before the six-year period had expired. In the nonpublished portion, we find no other prejudicial error. Hence, we will affirm.

I

FACTUAL BACKGROUND

A.    *Sexual Touchings: 1993-1996.*

Defendant and his wife had two children—Jane Doe[1] and Jane's younger brother. Jane was born in January 1984.

Starting when Jane was eight or nine and in fourth or fifth grade,[2] defendant began touching her sexually. Typically, when Jane was lying down, in bed or on a couch, defendant would approach her and start massaging her back. He would touch her breasts or her buttocks. Then he would rub her vaginal area, under her clothing. This happened at least once a week. Jane wanted to tell her mother, but she was too embarrassed, and she thought she would get in trouble.

---

[1]    Pursuant to stipulation, the trial court ordered that the victim be referred to by this fictitious name. (See Pen. Code, § 293.5.)

[2]    If Jane was indeed eight, that would mean that the touching could have started as early as January 1992. However, fourth graders are normally nine or ten; this would be consistent with Jane's statement to the police that she was nine when the touching started. For Jane to have been *both* (1) eight or nine *and* (2) in the fourth or fifth grade, the touching would have had to have started in September 1993 or later.

In January 1996, when Jane was 12 and in sixth grade, she was upset about something (by the time of trial, she no longer remembered what), so she told her mother that defendant had touched her breast; she did not disclose any of the other sexual touching. Her mother immediately confronted defendant and "kicked him out."

The family started going to counseling. The counselor reported the breast touching to the police. As a result, in August 1996, defendant pleaded guilty to one count of child molestation in violation of Penal Code section 647.6, a misdemeanor, allegedly committed in December 1995.

B. *Renewed Sexual Touchings, Mirrors, and Holes in the Wall: 1999-2002.*

In early 1999, Jane's mother let defendant move back in. About six months later, defendant started touching Jane sexually again. Typically, when Jane was in bed, asleep, defendant would rub her back, then touch her breasts and buttocks and rub her vagina on the outside of her clothes. At first, Jane felt frozen and could not move. Then she would pretend she was just waking up, and he would stop. This happened about once or twice a week, though some weeks, it did not happen at all. Jane did not tell anybody about it because she was afraid of breaking up the family again.

When Jane was about 16, she had a lock put on her bedroom door. After that, the touchings "pretty much stopped." "[A] couple [of] times," however, when Jane was getting dressed for school, she saw a small mirror slide under the door. It was a mechanic's mirror on a pole, such as defendant used in his work. This stopped after she stuffed a towel under the door.

4

One time, Jane looked into an uncovered cable outlet between her room and her brother's room and saw defendant looking back at her. She moved her nightstand to cover the outlet.

Jane started finding holes in the walls of her room. She blocked them with toilet paper or plaster. Jane told her mother that she thought defendant was watching her through holes in the wall, but her mother did not believe her.

C.    *Disclosure: 2002*.

In January or February 2002, defendant moved out. The family soon realized that he was having an affair with his wife's 23-year-old niece, Patricia.

Patricia promptly became pregnant. Patricia would telephone Jane and other family members and mock them; she said that Jane and her family would have to leave their house because it belonged to her now. In response, Jane told Patricia that she was going to beat her up. Meanwhile, defendant told Jane that he did not want her or her brother to visit him at work or telephone him.

Jane felt betrayed because "[she] had kept quiet to keep [her] family together" and now it was "pointless." Hence, on February 11, 2002, Jane called the police. At this point, she was 18.

Deputy Timothy Cleary conducted a preliminary interview of Jane. She told him that in 1996, she had reported that defendant had touched her breast, but actually, there had been additional incidents of sexual abuse; when she was between 9 and 12, defendant had touched her breast and vaginal area on a regular basis.

5

Jane also said that defendant was no longer touching her sexually; however, he would caress her hair and rub her back, supposedly to wake her up. She said she had put a lock on her door because she was afraid he would start touching her again. She did not say that defendant had in fact resumed touching her sexually. She mentioned the mirror under her door but did not mention the holes in the wall.

In April 2002, Officer Matthew Aveling, a trained child sex crime investigator, conducted a follow-up interview. Jane's statement to him was essentially consistent with her testimony at trial.

D.    *Pretext Meeting*.

In May 2002, at Officer Aveling's suggestion, Jane engaged in a pretext meeting with defendant.

During the meeting, Jane never explicitly accused defendant of a sexual offense. For example, she started by saying she wanted to talk "[a]bout everything that's happened." However, she did say, "I'm not talking about the divorce." She asked him to say he was sorry.

Defendant said: "You know I'm sorry what I did. I—I'm not really sorry for what I did, I'm really sorry that I hurt you. I didn't think you were gonna take it like that." Similarly, he said: "I am sorry. Not for what happened, I'm sorry . . . that you got hurt."

Jane did say: "And you think I never fuckin' saw you? With a mirror under my door?" Defendant replied: "Hey. I'm not talking about that." She accused him of making holes in the walls, but he denied this.

Jane also said: "I was like, asleep in my room, and you would come in and try to wake me up. And you thought I was asleep. I wasn't asleep." Defendant responded: "Why didn't you ever answer?" "Why didn't you answer when I asked you?" "When I tried to wake you up?"

Defendant also asked: "Why didn't you go to your mom? . . . [W]hy didn't you tell your mom back then?" Jane answered that she was "scared." Defendant said: "Scared? . . . [Y]ou didn't never look like you were scared."

E.    *Defendant's Partial Confession*.

On May 30, 2002, Deputy Aveling interviewed defendant. Defendant said that Jane was threatening to accuse him falsely of rape because she was angry about his relationship with Patricia.

On June 12, 2002, Michelle Gamboa, a police interviewer, interviewed defendant. This time, he admitted touching Jane inappropriately on two occasions — one involving a pool and one involving VapoRub.

That same day, Deputy Aveling *Mirandized*[3] defendant and interviewed him again. Defendant once again admitted the pool incident and the VapoRub incident.[4]

In the pool incident, according to defendant, Jane was 15; they were on vacation in San Felipe, Mexico. While she and defendant were "playing around" in a pool, defendant

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436.

[4]    Jane did not remember these specific incidents.

7

"felt [her] vagina." "I took my hand off[,] I went back for breast[,] and then . . . I went back and touched her again." "[E]very once in a while I would slide my hand and I touched it." When asked if he became aroused, defendant said: "Not an erection aroused[,] but I did . . . feel warmth." That night, he and his wife had "good, good sex."

In the VapoRub incident, defendant said, Jane was sick, so he rubbed Vicks VapoRub on her back, buttocks, and thighs; he became aroused, so he left the room. He then took a shower and masturbated while "[t]hinking about this[.]"

Officer Aveling told defendant that, according to Jane, defendant had touched her breast and vagina while playing. Defendant admitted that this had happened; at first, he said it happened "three or four" times, but later, he said it happened "ten, twenty times." He agreed that it made him "excited," but he pretended it was "an accident." He also agreed that he had committed a crime, that he knew it was wrong, and that he was remorseful.

When told that he was accused of touching Jane's breasts and crotch while she was asleep in bed or on a couch, defendant said: "That's a lie." However, he admitted that once, when she was lying on her stomach in his room, he massaged her back, buttocks, and legs; he touched her inner thighs, but not her crotch. He also touched her breast. He got an erection but did not masturbate. He volunteered that Jane had "pretty good breast[s]"; "they pop out."

Defendant admitted that he once tried to see Jane naked by sliding a mirror under her door, but he claimed it did not work. He also admitted making a hole once and trying

8

to look at her through it, but that did not work, either. He admitted that Jane "can probably think of more inciden[ts] than I can . . . ." At the end of the interview, he was arrested.

In 2003, sometime after his preliminary hearing, defendant fled to Mexico.

By 2008 or so, Jane was ready to forgive defendant, and they started talking again. Defendant asked her to help make "the charges go away." She responded that she "wasn't going to lie."

In 2010, defendant was located in Canada, arrested, and extradited.

F.    *Child Sexual Abuse Accommodation Syndrome*.

An expert psychologist testified about Child Sexual Abuse Accommodation Syndrome. In particular, she testified that most children who are sexually abused by a family member will delay disclosing the abuse for months or years, until some kind of crisis. When they do disclose, they may do so only partially, "testing the water."

G.    *Defense Evidence*.

Defendant took the stand. He admitted touching Jane's breast, resulting in his 1996 guilty plea. However, he claimed that the touching was not sexual. Jane would not give him the remote control for the television, so he "pinched her boob." Otherwise, he denied ever touching Jane inappropriately. He denied trying to look at her with a mirror or through holes.

Defendant claimed that, during the pretext meeting, he thought Jane was asking him to apologize for his relationship with Patricia. When he asked why she did not tell her mom, he meant about the mirrors and holes.

Defendant also claimed that he lied to Deputy Aveling because Deputy Aveling told him if he "g[a]ve him something that he can work with," he could go home.[5] Also, when Deputy Aveling said something and defendant responded "Right," defendant was not necessarily agreeing; he was just acknowledging the statement.

Defendant went to Mexico because he felt he "wasn't getting a fair trial . . . ." He claimed that, at the request of his bail bondsman, he turned himself in to the Mexican police, but he was released because the Riverside authorities declined to extradite him.

Jane's mother did not remember Jane getting a lock for her bedroom door. Jane's brother testified that the door already had a lock before defendant moved back in.

---

[5] Defendant did not explain why he supposedly lied to Gamboa. When asked why he supposedly made up the whole pool incident, when even by his own logic, it would have made more sense simply to admit Jane's allegations that he touched her while she was sleeping, he said: "For some reason that [i.e., the pool incident] popped up with Ms. Gamboa, and I couldn't back out and not continue lying to Mr. Aveling."

II

THE STATUTE OF LIMITATIONS

A.    *Additional Factual and Procedural Background.*

1.    *The initial complaint.*

The initial complaint was filed in August 2002.  It alleged that defendant committed four violations of Penal Code section 288, subdivision (a)(2).  The first two allegedly occurred between January 12, 1993 and November 30, 1995; the last two allegedly occurred between February 1, 1996 and January 11, 1997.

2.    *The initial information.*

The initial information was filed in March 2003.  It alleged that defendant committed nine violations of Penal Code section 288, subdivision (a)(2).  The first three allegedly occurred between January and December 1994; the next three allegedly occurred between January and December 1995; and the last three allegedly occurred between January and April 1996.

3.    *The amended information.*

The amended information was filed in June 2011.  It alleged that defendant committed six violations of Penal Code section 288, subdivision (a)(2), all between January 1994 and November 1995.  It further alleged that Jane reported these offenses to a law enforcement agency on February 11, 2002.

B.    *Analysis*.

Defendant did not raise the statute of limitations in the trial court.  However, "when the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time," including on appeal.  (*People v. Williams* (1999) 21 Cal.4th 335, 341.)  Thereafter, if the record establishes that the action is not time-barred, the conviction may stand; if, however, the appellate court cannot determine from the record whether the action is time-barred, it should remand for a further hearing.  (*Id*. at pp. 341, 345-346.)

If, on the other hand, the charging document does allege that the action is timely, any objection to the sufficiency of the evidence to prove timeliness must be raised in the trial court in the first instance — typically, by requesting a jury instruction on the subject.  "[A] defendant may forfeit factual issues relating to the statute of limitations when . . . the information alleges facts indicating that the prosecution was timely."  (*People v. Simmons* (2012) 210 Cal.App.4th 778, 793; accord, *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1288.)

Here, we need not decide whether the relevant charging document (regardless of whether that is the original information or the amended information) adequately alleged that the action was timely.  If it did, then defendant forfeited his present contention by failing to raise it below.  If, on the other hand, it did not, then defendant did not have to raise his present contention below; however, as long as the evidence at trial established that the action was, in fact, timely, we may affirm.

12

According to Jane's testimony, the sexual touching occurred at least once a week "from when it started, [when she was] around eight or nine, up until when it stopped, when [she] w[as] around 12[.]" In January 1996, when Jane was 12, she told her mother that defendant had touched her breast, and her mother kicked defendant out of the house. Defendant indirectly confirmed that the lewd acts continued into late 1995, by pleading guilty to the alleged breast touching. This evidence established that defendant committed at least six violations of Penal Code section 288, subdivision (a) in 1995.

This conclusion — that the crimes may be deemed to have been committed in 1995 — is the key point at which our analysis diverges from defendant's. We will discuss defendant's contrary arguments below. First, however, we explain how this conclusion necessarily means that the prosecution was timely.

The maximum penalty for a violation of Penal Code section 288, subdivision (a) is eight years. (Pen. Code, § 288, subd. (a), in effect since at least 1982, see Stats. 1981, ch. 1064, § 1, p. 4093.) As of 1995, the basic statute of limitations for a crime punishable by imprisonment for a maximum of eight years or more required that the "prosecution . . . be commenced within six years after commission of the offense." (Pen. Code, § 800, in effect since at least 1985, see Stats. 1984, ch. 1270, § 2, p. 4335; see also Pen. Code, § 805, subd. (a), in effect since at least 1985, see Stats. 1984, ch. 1270, § 2, p. 4336.)

A prosecution is commenced, as relevant here, when an information is filed. (Pen. Code, § 804, in effect since at least 1985, Stats. 1984, ch. 1270, § 2, p. 4336.)

Effective January 1, 2001, the Legislature enacted an alternative limitations period for specified sex crimes, including a lewd act on a child (see Pen. Code, § 290, former subd. (a)(2)(A), in effect since at least January 1, 2001, Stats. 2000, ch. 649, § 2.5, pp. 4283-4284, renumbered as Pen. Code, § 290, subd. (c), effective October 13, 2007, Stats. 2007, ch. 579, § 8, pp. 4811-4812); prosecution could be "commenc[ed] . . . 10 years from the commission of the offense," but only if the basic six-year period had not yet expired as of January 1, 2001 (Pen. Code, § 803, former subd. (h)(2), Stats. 2000, ch. 235, § 1, p. 2342, renumbered as Pen. Code, § 803, former subd. (i)(2), Stats. 2001, ch. 235, § 1, p. 2126, renumbered as Pen. Code, former § 801.1, Stats. 2004, ch. 368, § 1, p. 2722).

Here, with respect to violations of Penal Code section 288, subdivision (a), committed from January 1 through December 31, 1995, the basic six-year limitations period did not expire until January 1 through December 31, 2001, respectively. Accordingly, when the new 10-year limitations period came into effect, the basic six-year period had not yet expired. Moreover, as of March 2003, when the original information was filed, the 15-year limitations period had not expired. Thus, the original information was timely.

Finally, the amended information did not charge any new or additional violations of Penal Code section 288, subdivision (a). The original information had charged a total of nine: three occurring in 1994, three occurring in 1995 and three occurring in 1996; the amended information alleged only six, all occurring between 1994 and 1995.

14

Accordingly, the amended information related back to the original information and must be deemed timely. (*Harris v. Superior Court* (1988) 201 Cal.App.3d 624, 627-628; see also Pen. Code, § 803, subd. (b) ["No time during which prosecution of the same person for the same conduct is pending in a court of this state is a part of a limitation of time prescribed in this chapter"], in effect since at least 1985, see Stats. 1984, ch. 1270, § 2, p. 4335.)

Ortega accuses us of trying to have it both ways. If, as we conclude, all six counts charged in the amended information actually occurred in 1995, then he might accept arguendo that three counts can relate back to the three 1995 counts alleged in the original information, but he argues that the *other* three counts *cannot* relate back to the three *1994* counts alleged in the original information, because they are not the "same conduct."

The original information and the amended information, however, both alleged all dates of commission using the words "on or about." Lewd acts that allegedly occurred "on or about" 1994 (according to the original information) can be the same conduct as lewd acts that allegedly occurred "on or about" 1994-1995 (according to the amended information). In any event, it has been held that, if the prosecution amends to correct a date, that will not prevent the amended pleading from relating back to the original: "The amendment of an information in a criminal case by merely changing the alleged date of the offense charged, as was done in this case, like any other amended pleading, relates back to the date of the original filing of the information, and has the effect of tolling the

15

running of the statute of limitations from the date of the filing of the original information. [Citations.]" (*In re Davis* (1936) 13 Cal.App.2d 109, 113-114.)

In arguing that three counts of the amended information do not relate back, defendant relies on *People v. Terry* (2005) 127 Cal.App.4th 750. *Terry*, however, involved an original pleading that alleged (as relevant here) one lewd act count and amended pleadings that replaced it with six lewd act counts in the same time frame. (*Id.* at p. 757.) The court held that the amended pleadings did allege the "same conduct" as the original pleading and therefore did not relate back. (*Id.* at pp. 767-768.) Here, the number of counts did not change; all that changed were their alleged dates. As already discussed, a mere date change does not prevent an amended pleading from relating back.

| Date(s) | Event | Limitations period |
|---|---|---|
| All relevant times | | Basic six-year limitations period |
| 1992 or 1993 | Date lewd acts began | |
| January 1994-November 1995 | Dates of lewd acts, according to amended information and according to jury verdicts finding defendant guilty "as charged" | |
| January 1996 | Date lewd acts ended | |
| January 2001 | | New alternative 10-year limitations period, effective only if basic limitations period has not yet expired |
| March 2003 | Original information filed | |
| June 2011 | Amended information filed | |

So far, our analysis is based on the premise that the offenses were committed in 1995. Defendant understandably attacks this premise. He points out that Jane's testimony was "generic," in the sense that she could not specify the date (or any other

16

distinguishing characteristics) of any particular violation.  Although the jury was given a unanimity instruction (CALCRIM No. 3501), defendant claims it is impossible to tell whether the jurors agreed unanimously that all six counts were committed in 1995; they may have found that some or all of them were committed in 1994.

This is precisely the type of factual issue that defendant forfeited by not requesting that the jury be instructed on the statute of limitations.  If it had been so instructed, it could and would have made the assertedly omitted finding.  Under *Williams*, in light of defendant's forfeiture, our task is to determine whether the record shows, as a matter of law, that a prosecution of defendant for six violations of Penal Code section 288, subdivision (a) allegedly committed between January 1994 and November 1995 is timely.  Because the record shows that defendant violated Penal Code section 288, subdivision (a) at least 48 times between January 1994 and November 1995, we may conclude that the prosecution was timely as a matter of law.

In so holding, we are merely following *People v. Smith* (2002) 98 Cal.App.4th 1182.  There, the victim testified that three types of molestations — "buttock fondlings," "playful spankings," and "violent spankings" — occurred "regularly," "hundreds of [times] over a seven-year period."  (*Id.* at p. 1189.)  The defendant was charged with 17 violations of Penal Code section 288 or 288.5 — count 1, allegedly committed in 1989 or 1990; count 2, allegedly committed in 1990 or 1991; and counts 3 through 17, each allegedly committed between 1991 and 1996.  (*Smith*, *supra*, at pp. 1185-1186.)  To be timely under the basic six-year limitations period, each count had to have been committed

17

on or after October 26, 1992.  However, under an alternative statute of limitations, they would be timely as long as the defendant had committed at least one additional violation of Penal Code section 288 or 288.5 against the same victim within the basic six-year limitation period.  (*Smith, supra,* at pp. 1186, 1188, 1191.)  The jury was not required to make any findings regarding the statute of limitations.  (See *id*. at p. 1187.)

The appellate court "conclude[ed] that we can evaluate whether the record demonstrates that defendant committed at least one violation of section 288 within the [basic six-year] limitation period without determining which acts the jury relied upon to convict defendant of violating . . . section 288 . . . ."  (*People v. Smith*, *supra*, 98 Cal.App.4th at p. 1188.)  It explained:  "Here, the trial evidence allowed for only two possible conclusions, namely, that all the section 288 molestations identified by [the v]ictim had occurred or none had occurred. . . .  At trial, defendant presented the same defense to each described act, namely, that he may have committed it but that he lacked the requisite sexual intent when he did so.  Defendant did not seriously dispute that the acts occurred over the period identified by [the v]ictim.  After reviewing the available record, we conclude that it contains overwhelming evidence that defendant *committed* all of the hundreds of acts described by [the v]ictim with the requisite intent, including the multitude of described acts which occurred regularly between October[] 26, 1992, and April 20, 1996."  (*Id*. at pp. 1189-1190.)

Here, identically, the evidence presented the jury with an all-or-nothing proposition — between 1992 or 1993 and January 1996, defendant committed lewd acts

at least weekly, or not at all.  It afforded no basis for a finding that he committed lewd acts in 1994, but not in 1995.  If the jury had been instructed to determine, for purposes of the statute of limitations, whether defendant committed lewd acts at least six times in 1995, it would have found that he did.

Defendant relies on *People v. Angel* (1999) 70 Cal.App.4th 1141.  There, the victim testified that, when she was between 7 and 16 (i.e., roughly between 1982 and 1991), the defendant molested her "on numerous occasions" and at least once a month. (*Id.* at pp. 1143-1144.)  The defendant was charged with multiple sex offenses against a child, including two counts allegedly committed in July 1989.  (*Id.* at pp. 1143, 1145.) These counts were timely if, and only if, the underlying acts were committed on or after July 20, 1989.  (*Id.* at p. 1146.)  The jury was not instructed on the statute of limitations. (*Id.* at p. 1145.)

The appellate court reversed the conviction on these two counts.  It stated:  "The People must plead and prove, by a preponderance of the evidence, that prosecution commenced within the statutorily prescribed time period.  [Citations.]  Here, given [the victim]'s testimony that appellant committed numerous acts within the time alleged in counts 17 and 18, the offenses charged therein could have occurred before or after the limitations period expired.  The prosecution never proved the offenses could only have occurred within the applicable period; moreover, although jurors were instructed that they had to agree on the act(s) constituting the offense, they were never instructed on the statute of limitations.  Absent such an instruction, the equivocal proof failed to overcome

19

the prosecution's burden.  [Citations.]  Since we cannot tell whether the jury convicted appellant of offenses not shown to have been committed within the period of limitations, the convictions are fatally defective unless the statute of limitations was tolled. [Citation.]"  (*People v. Angel*, *supra*, 70 Cal.App.4th at pp. 1146-1147, fn. omitted.)

*Angel* is distinguishable, because it appears that there, the victim's testimony would not have supported a finding that any molestation occurred specifically between July 20 and 31, 1989.  Somewhat to the contrary, she testified that the defendant was molesting her at least once a month; thus, it was possible that he molested her only once in July 1989, sometime earlier than July 20.  Here, by contrast, Jane testified that defendant was molesting her at least weekly; this necessarily means that he did molest her at least six times in 1995.

In *Smith*, the court noted that its holding was in tension with *Angel*, but it added: "To the extent the *Angel* decision contradicts our analysis or conclusions, we respectfully disagree with it."  (*People v. Smith*, *supra*, 98 Cal.App.4th at p. 1192.)  *Smith* also noted that *Angel* was decided several months before *Williams*; thus, "the *Angel* court did not have the benefit of the analysis and holding of the pertinent Supreme Court case . . . ." (*Smith, supra,* at p. 1192.)  For all these reasons, we conclude that *Smith*, rather than *Angel*, is controlling here.

Incidentally, the People appear to be somewhat confused about when the offenses should be deemed to have been committed.  They state:  "The acts at issue . . . started in January 1994 and continued until November 1995.  The statute of limitations thus

20

commenced to run on the earliest of those dates." Actually, the amended information alleged, and the jury found, that the acts took place between January 1994 and November 1995; however, the evidence showed they took place at least weekly between 1992 or 1993 and January 1996. The issue before us is not whether the accusatory pleading adequately alleged that the prosecution was timely. If it was, we would agree that a crime allegedly committed just once, sometime between January 1994 and November 1995, must be deemed to have been committed on the earliest of these dates. However, we are assuming that the information was defective. Hence, the issue is whether the record as a whole establishes that the prosecution was timely. Thus, we may look beyond the allegations of the information.

Given this confusion, the People do not rely on the alternative 10-year limitations period. Rather, they rely on yet another limitations period — Penal Code section 803, former subdivision (f) (in effect since at least January 1, 1994 as Pen. Code, § 803, former subd. (g), Stats. 1993, ch. 390, § 1, p. 2226, renumbered as Pen. Code, § 803, subd. (f) by Stats. 2005, ch. 479, § 3, p. 2978), which provides that, under certain circumstances, "a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section . . . 288 . . . ." In light of our conclusions, we need not consider the applicability of this limitations period.

21

III

FAILURE TO INSTRUCT THE RECONSTITUTED JURY

TO START ITS DELIBERATIONS ANEW

Defendant contends that, when one juror was replaced with an alternate, the trial court erred by failing to instruct the jury to restart its deliberations.

A.      *Additional Factual and Procedural Background.*

On June 22, 2011, at 3:25 p.m., the jury began deliberating.  It broke for the day at 4:00 p.m.

On June 23, 2011, the jury resumed deliberating at 12:15 p.m.  At 1:30 p.m., it sent out a question and a request for a readback.  Thereafter, because one juror had to leave on a scheduled trip, the trial court excused that juror and replaced him or her with an alternate.  The alternate was contacted and told to report to court the next day at 8:30 a.m.

On June 24, 2011, at 8:30 a.m., the jury retired to resume deliberations.  There was no court reporter; the minute order does not indicate that the trial court gave any further instructions.  At 10:10 a.m., the jury indicated that it had reached a verdict.

B.      *Analysis.*

The state constitutional right to trial by jury "requires each juror to have engaged in all of the jury's deliberations."  (*People v. Collins* (1976) 17 Cal.3d 687, 693; see also *id.* at pp. 692-693 & 692, fn. 3.)  Hence, if a juror is replaced by an alternate after deliberations have begun, the trial court must instruct the jury "to set aside and disregard

22

all past deliberations and begin deliberating anew." (*Id*. at p. 694.) The standard instruction for this purpose is CALCRIM No. 3575.

The fact that, at least according to the record, the trial court in this case did not give such an instruction is startling. It would seem that, when the alternate juror showed up for duty on June 24, 2011, the court would have said *something* to him or her. There was no court reporter, which would explain why the reporter's transcript does not reflect such an exchange. Even so, however, if the trial court did instruct the jury further, the minute order should reflect that; yet it does not. The People have not asked to augment the record with a settled statement. Thus, defendant has carried his burden of demonstrating error by an adequate record.

A failure to give CALCRIM No. 3575 violates the state Constitution but not the federal Constitution. (See *Hernandez v. McGrath* (E.D.Cal. 2008) 595 F.Supp.2d 1111, 1141, and cases cited.) Thus, the error is harmless if "there [is] no reasonable probability that a more favorable verdict would have been returned had the jury been properly instructed following the substitution." (*People v. Collins*, *supra*, 17 Cal.3d at p. 697.) "[W]e may consider whether the case is a close one and compare the time the jury spent deliberating before and after the substitution of the alternate juror. [Citations.] In *People v. Odle* [(1988)] 45 Cal.3d 386, [the Supreme Court] concluded there was no prejudice where the case against the defendant was overwhelming and where the jury deliberated only part of one afternoon prior to substitution of the alternate juror and two and one-half days thereafter. [Citation.] In *People v. Collins*, *supra*, 17 Cal.3d 687, . . . [the Supreme

23

Court] determined the error was not prejudicial where the case against the defendant was very strong, and the jury had deliberated little more than one hour prior to substitution of the alternate and had returned a verdict after several additional hours. [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 537.)

This was not a close case. Admittedly, the pretext meeting fell way short of a smoking gun. Nevertheless, some of defendant's statements in it were inconsistent with innocence. For example, when Jane said, "And you think I never fuckin' saw you? With a mirror under my door?," defendant did not ask her what she was talking about; rather, he said, "Hey. I'm not talking about that." Likewise, when Jane said, "[Y]ou would come in and try to wake me up. And you thought I was asleep. I wasn't asleep," defendant seemed to understand what she was talking about and why it was relevant; he simply asked her why she had not answered him.

In addition, defendant had pleaded guilty to molesting Jane at least once before. By fleeing to Mexico, he showed consciousness of guilt. Also, as the prosecutor pointed out in closing argument, if Jane had been lying, to get back at defendant for leaving the family for Patricia, she would have concocted a more damning story. She could have said that he raped her; she could have said that she saw him masturbating while touching her; she could have said that she remembered the pool and VapoRub incidents.

Most important, however, defendant gave Deputy Aveling a partial confession. He admitted the pool incident, in which he touched Jane's breast and vagina for sexual gratification. He also admitted the VapoRub incident, in which he rubbed her buttocks

24

and thighs and got an erection.  He admitted masturbating while thinking about this.  Eventually, he admitted that, while pretending to play with Jane, he had touched her breasts and/or vagina some "ten, twenty times."  During this confession, he referred to Jane in distinctly nonparental terms.  For example, he volunteered that she had "pretty good breast[s]"; "they pop out."

While defendant did not admit all of Jane's allegations, it would be typical of a sex offender to attempt to minimize his conduct.  The admissions that he did make were simply not things that an innocent father would make up about his daughter.

Moreover, defendant's explanation for his confession to Deputy Aveling was illogical and unconvincing.  He testified that Deputy Aveling had told him that, if he confessed to something, he could go home.  In other words, as he admitted on cross-examination, he claimed to believe that, if he confessed, he would be released, but if he maintained his innocence, he would be arrested.  This makes no sense.  Moreover, this claim was belied by the fact that, at the end of the interview, when Deputy Aveling did arrest him, defendant took it in stride; he did not protest that Deputy Aveling was breaking some kind of promise.  Finally, none of this explained why defendant had previously confessed to Gamboa.

The timing of the jury's deliberations also demonstrates harmlessness.  The jury had deliberated for a grand total of an hour and 45 minutes before the alternate was substituted.  Thereafter, it deliberated for another hour and 40 minutes before reaching a verdict.  This indicates that the alternate did participate meaningfully in the deliberations,

25

and that instructing the jurors to ignore their brief previous deliberations would not have made any difference.

Defendant argues that in *Odle* and *Collins*, the deliberations *before* the alternate was substituted were much shorter than the deliberations *after* the alternate was substituted. While this is certainly a factor to be considered, here there is a countervailing factor: There is some affirmative indication that the jury *did* start its deliberations anew. On June 23, before breaking for the day, the jury had sent out one question and one request for a readback. It is not clear whether the trial court ever responded to the question; it wrote an answer on the question itself , but the record does not reflect that it ever delivered this answer orally to the jury. It is clear, however, that the court reporter never gave the readback. Thus, it appears that the jury started its deliberations anew, without waiting for the requested readback.

Defendant also points to the fact that his first trial ended with a hung jury. However, he has not provided us with a reporter's transcript of the first trial. At that point, defendant was charged with 22 counts, and the evidence presented may well have been quite different. Indeed, in connection with defendant's motion for new trial, the prosecution pointed out a number of differences in the evidence that collectively tended to strengthen its case.

In sum, on this record, defendant cannot show that, even if the jury had been instructed to begin its deliberations anew, the outcome would have been any more favorable to him.

IV

DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RICHLI
                                                                    J.

We concur:


HOLLENHORST
                Acting P. J.


McKINSTER
                            J.