Filed 6/20/22  P. v. Granados CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSCAR GARITA GRANADOS,<br><br>    Defendant and Appellant. | D079887<br><br><br>(Super. Ct. No. MCR060141) |


APPEAL from a judgment of the Superior Court of Madera County, Joseph A. Soldani, Judge.  Affirmed.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

When seven-year-old Alyson Doe told her aunt Paloma M. that her grandfather Oscar Garita Granados had touched her private parts, Paloma

reported the information to Alyson's mother, Karina Doe. Karina reached out to family members, including her older half-sister, Elisa Doe, and a younger half-sister, Elsie Doe, to ask if they had any experiences of sexual abuse by Granados. Karina herself recalled being molested by Granados when she was young, but she had suppressed the memories before she learned about Alyson. Elisa and Elsie both reported that they, too, had been inappropriately touched by Granados. Karina reported the incident to police, who investigated the allegations.

The People filed an information against Granados, alleging he committed lewd and lascivious acts upon three victims, Elisa, Karina, and Alyson, each under the age of 14 (Pen. Code,[1] § 288, subd. (a)). Granados was also charged with a special allegation for sexual acts against multiple victims (§ 667.61, subds. (a) & (d) [Alyson]; subds. (b) & (e) [Elisa]). The information also alleged three or more acts of substantial sexual conduct and three and more acts violating section 288 against a fourth victim with whom he resided, Elsie, who was under the age of 14 at the time (§§ 288.5, subd. (a); 1203.066, subd. (b)).

At trial, the People introduced, among other evidence, transcripts and videos of Granados's interrogation interviews, testimony by Paloma about Alyson reporting the molestation to her, and evidence of prior, uncharged acts committed against Elisa. The jury acquitted Granados on two counts, the charges brought relating to Karina and Elsie. But it convicted Granados on the charges relating to Elisa and Alyson, and the jury found the special allegation of multiple victims true.

---

[1] Further statutory references are to the Penal Code, unless otherwise specified.

The court sentenced Granados to 15 years to life for his crimes against Elisa and 25 years to life for his crimes against Alyson, for an aggregate prison term of 40 years to life.

On appeal, Granados challenges (1) the charges relating to Elisa, contending they are barred by the statute of limitations. He also challenges (2) the imposition of a life sentence as a violation of ex post facto limitations, (3) the voluntariness of his *Miranda*[2] waiver, and (4) the subsequent voluntariness of his confession. He contends (5) his attorney's failure to request the interrogation be excluded or redacted demonstrates ineffective assistance of counsel; (6) the use of CALCRIM No. 1191A was improper because it allowed testimony by one of the victims; (7) the admission of evidence under Evidence Code section 1108 was unfairly prejudicial because it was confusing; (8) the admission of evidence of uncharged acts violated his due process rights; (9) the court erred by failing to sua sponte instruct the jury on attempted lewd and lascivious conduct; and (10) by admitting the fresh complaint testimony provided by Paloma. Finally, Granados maintains that (11) even if these errors are not individually prejudicial, cumulative error warrants reversal.

We conclude (1) the charges against Elisa were not barred by the statute of limitations, and (2) the sentence here does not pose any ex post facto problem. (3) Granados forfeited his challenges to his *Miranda* waiver and (4) the voluntariness of his confession, as well as (5) any challenge to the admission of his interrogation statements. We further conclude (6) the use of CALCRIM No. 1191A was appropriate, (7) the court did not abuse its discretion by allowing the evidence of the uncharged crimes, and (8) the introduction of that evidence did not violate Granados's constitutional rights.

---

[2]    (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

3

Finally, (9) the court had no obligation to offer a sua sponte instruction for attempt, (10) it did not err by admitting the fresh complaint evidence, and (11) there is no cumulative error. Accordingly, we will affirm the judgment.

## I

## BACKGROUND AND PROCEDURAL FACTS

### A. Incidents Leading to Investigation

Karina worked an overnight shift on occasion, so she sometimes left her children at her parents' house, on Calaveras Street, where she also grew up. When her mother was working, sometimes Granados watched the children alone.

Paloma also babysat Alyson and her brother frequently, often overnight. On August 4, 2018, the children were playing on a bed in Paloma's mother's home when Paloma observed Alyson's brother bite Alyson below the waistline. Paloma told the children that it was not okay for Alyson's brother to bite her because that harms Alyson, and she told the children it was also not okay for others to touch their private areas, even family members. A few minutes later, Alyson told Paloma that her grandfather, Granados, touched her in the areas that Paloma just said were private. Alyson told Paloma her grandfather touched her private parts over and under her clothes. Paloma reported what Alyson said to Karina.

### B. The Pretext Call

After she spoke to Paloma, Karina went to the police, who investigated. Officer David Ochoa had Karina conduct a pretext call with Granados on August 14, 2018. During the call, Karina asked Granados if it were true that he had touched Alyson in places where Alyson should not be touched. Granados denied touching Alyson inappropriately.

4

However, Granados revealed that Alyson had complained about an itching or pricking on her skin and bottom, so he had looked at the area below her waist on her backside. He put some cream on the irritation. He also told Karina that he had hugged and kissed Alyson, in the way an affectionate grandparent would, because he thought Alyson was lacking affection from her father. And he explained that sometimes Alyson asked him to lay down with her while she was watching TV, but he was usually busy with other activities. He said he never touched Alyson inappropriately.

Paloma also told Karina that something had happened to Karina's younger sister Elsie. Karina called Elsie to ask whether anything had happened to her with Granados. When Karina mentioned to Granados that Elsie told her about things Granados had done when she was little, Granados denied ever doing anything to Elsie. But when Karina mentioned her older, half-sister Elisa during the call, Granados admitted something had happened, but he said he did not "do things as—as a man." He had hugged Elisa, and something had happened, but he said it was a long time ago.

## C. The Interrogation

The next day, police visited Granados at his home and asked him to come in for questioning. When police arrived at Granados's home, Granados was outside, and police explained they wanted to talk to him, but not in front of his neighbors. Granados told an officer he could imagine the topic because his daughter had called the previous day. Officer Ochoa accompanied Granados as he collected his keys, shoes, and wallet, and they chatted. They talked about Costa Rica after Granados volunteered his family was from there, and Officer Ochoa asked about Granados's travels on his motorcycle after the pair passed by the vehicle.

Once at the police station, Officer Ochoa read Granados his *Miranda* rights, which Granados waived. Officer Ochoa explained he knew something had happened between Granados and his granddaughter Alyson, and he was not sure whom to believe. Officer Ochoa told Granados he knew Granados was a good person, and he wanted to get Granados's story so he could hear another point of view.

Granados explained that sometimes he and/or his wife watched his granddaughter Alyson, and while Alyson watched television with her brother in a bedroom, sometimes she asked Granados to lie down on the bed with them, and so he did.

Once Alyson asked Granados for a cream or oil because something was itching her on her hip, near her buttocks. Granados pulled down Alyson's pants to make sure there was not a welt, and he applied the cream.

Granados told Officer Ochoa that another time, while hugging Alyson with both arms, she grabbed his hand and tried to lower it toward her vagina. He told her not to do that because it was dangerous, and he would be put in jail. He did not tell Alyson's mother about the incident because he did not want her to scold Alyson.

Granados denied ever touching his daughter Elsie.

Granados told Officer Ochoa "something did happen" with his stepdaughter Elisa when she was around 14 or 15 years old, but he did not fondle Elisa. Though he "lost his head," they did not have "relations," which he defined as vaginal penetration with his penis. Initially, he told Officer Ochoa he would hug Elisa and get a bit close, and that she liked it, but he did not touch her inappropriately; he could not remember if he had touched her breasts, but he did not touch her vagina or her buttocks.

6

Granados eventually explained that he kissed Elisa around the neck and on the cheek. He felt horny, and he hugged her tightly and developed an erection, which he believed Elisa felt. Granados also admitted he put his hands under Elisa's clothes, and he commented about females, "[I]f she doesn't say anything, well, one wants to slide the hands down or touch something." He told Officer Ochoa that when he put his hand in Elisa's pants, she pulled his hand back up when it reached her buttocks because she did not like having her buttocks touched. He also told Officer Ochoa that he had made a mistake and regretted it.

He said he never slid his hands down the front of her pants under her clothes. When Officer Ochoa asked if Granados touched Elisa's vagina, Granados said he did not remember doing that. Granados repeatedly denied any penetration with Elisa.

Officer Ochoa told Granados that the people who reported the incidents to the police said there had been penetration with Elisa. He explained that he wanted to know the truth, and "if there is a way I can help you . . . that's why I need to know."

Over the course of several interviews throughout the day, Officer Ochoa repeatedly implored Granados to tell the truth. He told Granados that he had worked as an officer for a long time, and he could tell if a person was lying or not telling the whole truth. He explained that he works with kids in school, and when a seven year old is descriptive, it makes him think she is telling the truth. So, Officer Ochoa told Granados that he knew the truth, and if Granados were untruthful, Officer Ochoa could not help him. He said he thought Granados was not telling him everything, and that if Granados did not tell the truth completely, he could not help Granados, and Granados would end up in jail.

7

Officer Ochoa repeatedly mentioned wanting to help Granados. He clarified that he did not want Granados to create stories to make him happy, but if there was a way he could help Granados, he would, that he would listen to the whole story, and that he wanted Granados to reveal the truth to "allow us to end this here . . . and let's everyone go home."

Officer Ochoa told Granados he also wanted to help the victims: "I want to help them. I don't want to be unfair with you, I don't want to be unfair with them." And he offered to help Granados write an apology letter to Elisa.

Eventually, Granados asked Officer Ochoa, "What does help consist of?" Officer Ochoa responded, "The help consists of knowing the truth, because let's say, I let you go, then something comes up, I can't help you anymore, now this time—now you're lying to me and now you're getting in more trouble, do you understand me?" Granados commented he thought maybe the officer was going to send him to a psychologist because this was affecting him. Officer Ochoa clarified that if Granados were dishonest, the victims might be angry with the police because they know the truth of what happened.

Officer Ochoa also told Granados that sometimes suspects do not remember details, and in his experience, when a person says they should not go to jail for something they do not remember, it is not an excuse for avoiding jail.

Video of the interviews were played at trial for the jury, and transcripts were admitted into evidence.

### D. The Forensic Interview

Karina took Alyson for a forensic interview, which was conducted by Angelica Limon. Limon told Alyson it was her job to talk to kids to make

sure they are safe. Alyson said no one had ever bothered her or done anything she did not like.

Limon reviewed with Alyson good touches, bad touches, and secret touches, and she used a diagram to review the body parts. Using the diagram, Limon asked Alyson if anyone touched her buttocks, and Alyson indicated Granados had "a long time ago" when she was seven years old.[3] Limon pointed to other parts of the body on the diagram and asked if Granados had used any parts of his body to touch the various parts. Alyson said Granados kept touching her where she did not want him to touch her. She said he lifted up her shirt to lick her under it, and he licked the part girls use to pee, on the inside and the outside. He also touched her butt with his hand over and under her clothes. He would tell her to take off her underwear. He told her not to tell anybody.

Limon asked Alyson if anyone told her what to say in their interview, and Alyson said no. Alyson said everything she talked about was the truth.

### E. The Charges

The People filed a criminal complaint against Granados on August 16, 2018 and followed it on November 20, 2018 with an information that contained charges relating to four victims. On February 11, 2019, the People filed a first amended information, which Granados did not oppose. That information, the operative one in this matter, charged Granados with committing a lewd and lascivious act upon Elisa, who was under age 14, between December 19, 1994 and December 18, 1995 (§ 288, subd. (a); count 1); violating section 288.5, subdivision (a) by engaging in three and more acts of "substantial sexual conduct" (§ 1203.066, subd. (b)) and three and more acts in violation of section 288 with Elsie, a child under age 14

---

[3]    Alyson was still seven years old at the time of the interview.

(count 2); committing a lewd and lascivious act upon Karina, who was under age 14 (§ 288, subd. (a); count 3); and committing lewd and lascivious acts upon Alyson, a child under age 14 (§ 288, subd. (a); count 4). The People also alleged multiple victims (§ 667.61, subds. (a) & (d) [Alyson]; subds. (b) & (e) [Elisa]) as to counts 1, 3, and 4. As to count 2, the People alleged the victim was under 18 at the time of the offense and under 40 at the time of the information (§ 801.1, subd. (a)).

## F. Trial Testimony

### 1. *Angelica Limon*

At trial, Limon testified as an expert witness about her August 2018 forensic interview of Alyson. She discussed the diagram she used with Alyson during the interview and testified that Alyson told her Granados used his hand to touch her chest. The People introduced a transcript of the interview and played the video of the interview for the jury.

### 2. *Elisa Doe*

Elisa testified that she lived with her mother and Granados when she was 13 at the house on Calaveras Street. She lived with her mom, Granados, and their children, Karina and two younger boys. When she was 13, she and Karina shared a room with bunk beds. Elisa slept on the top bunk. There were many times when she would wake up at night to Granados putting his hands down her underpants or touching her breasts. She said that no specific incident from when she was 13 stood out because it happened frequently, primarily at night or when her mother was not around.

Elisa said she remembered it happening first when she was around 10 or 11 years old. She remembered the age it started because she came to the United States when she was nine years old and lived in Fresno for about a year and a half before moving to Calaveras Street, and the molestation

10

began right before that move, when she was around 10 and a half or 11 years old. Defense counsel did not object to questions about Elisa's age.

Elisa did not report the abuse because she was ashamed, and Granados had threatened her.

3. *Elsie Doe*

When Karina called Elsie and asked if something had ever happened because something was happening with Alyson, Elsie confirmed something had happened. Elsie had never said anything when she was younger because she was afraid and did not know whom to tell.

Elsie testified that when she was a few months old, her parents separated, and she would visit her father, Granados, overnight some weekends at his home on Calaveras Street. Sometimes she would share a bed with Granados and her stepmother, and she remembered being touched every now and then at nighttime. Granados would slip his hand under her underwear and cup her vagina. She estimated the touching began around age six to eight. It happened frequently enough that she was not surprised by it. She also recalled Granados grabbing her butt in public when she was around age 13, and Granados positioning her leg between his, up against his groin, while they were in bed.

4. *Karina Doe*

When Karina was around 11 or 12 years old, she felt pain in her chest area once and went looking for her mom. When she found Granados instead, she told him her breasts hurt, and he told her to sit down and let him see. He grabbed her breasts, then let them go. Karina asked Granados what he was doing, but he did not respond. It felt wrong to her, and she walked out, crying. Karina never mentioned the incident to her mother. Sometimes, when Karina was sitting next to Granados in the passenger seat of the car,

he put his hand on her thigh area and told her not to let anybody put a hand there and touch her wrong. Karina had suppressed these memories, so she did not think anything was happening to her children at her parents' home.

Although Karina shared a bedroom with Elisa and slept on the bottom bunk, she never awoke to anything unusual going on in the room.

5. *Alyson Doe*

Alyson testified that she used to stay with her grandparents at their home on Calaveras Street, and she talked to her mom and Paloma about him.

When shown the diagram of a body, Alyson testified that when she was in second grade, Granados touched her on the middle portion of the drawing. She also said Granados touched her private area, both the front and back side, a long, long time ago, when she was in second grade. She said he would touch her private area at nighttime, in the house on Calaveras Street, with his hand.

6. *Oscar Granados*

Granados testified on his own behalf. He denied molesting Elisa or Alyson. When asked about touching Elisa, Granados said he tried to lower his hands to her buttocks, but she did not permit it. He also testified it happened just one time, when Elisa was 14.

Granados acknowledged he had an erection when he hugged Elisa, but said that reaction only occurred once. And he testified that Elisa was affectionate with him because Elisa knew there were marital problems. He explained he did not go too far with Elisa because he did not take off her clothes or touch her buttocks, but he did need to "pull [himself] back" because of his erection. He denied touching Elisa's vagina or buttocks.

12

## G. Verdict & Sentencing

On March 7, 2019, a jury acquitted Granados of counts 2 and 3, relating to Elsie and Karina. It convicted Granados on counts 1 and 4, for committing lewd and lascivious acts upon and with a child under age 14, in violation of section 288, subdivision (a). The jury found true that Granados had committed the offense against more than one victim (§ 667.61).

The court denied probation and sentenced Granados on April 5, 2019 to an aggregate term of 40 years to life, consisting of 15 years to life on count 1 and 25 years to life on count 4.

Granados timely appealed.

## II

## DISCUSSION

### A. Statute of Limitations

" '[W]hen the charging document indicates on its face that an action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time,' including on appeal." (*People v. Ortega* (2013) 218 Cal.App.4th 1418, 1427 (*Ortega*), quoting *People v. Williams* (1999) 21 Cal.4th 335, 341.) The limitations period ends when an information is filed. (§§ 800, 803, 804.) A court must dismiss charges filed after a statute has run due to an irrebuttable presumption that a defendant's right to a fair trial is prejudiced unless the statute of limitations has been tolled. (See *United States v. Marion* (1971) 404 U.S. 307, 322; *People v. Angel* (1999) 70 Cal.App.4th 1141, 1144, 1150.) We review the issue de novo. (*People v. Brown* (2018) 23 Cal.App.5th 765, 772; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1270.)

A crime's maximum possible punishment, without consideration of enhancements, determines the offense's statute of limitations. (§ 805, subd. (a); *People v. Lopez* (1997) 52 Cal.App.4th 233, 238, fn. 1.) Granados contends the operative sentencing scheme here is section 800, which limits the term of punishment for violating section 288, subdivision (a) to eight years (see *Ortega, supra,* 218 Cal.App.4th at p. 1428) and therefore sets the statute of limitations at six years (§ 800). The Attorney General concedes that if a six-year statute of limitations were applicable, the charges in count 1 would be barred. But the Attorney General contends the alternative sentencing scheme found in section 667.61, subdivision (e), the One Strike law, controls count 1.

The One Strike law sets the prison term for violating section 288, subdivision (a) where there are multiple victims at 15 years to life. (§ 667.61, subd. (b).) Because an offense punishable by life in prison "may be commenced at any time" (§ 799), the application of section 667.61 would extend the statute of limitations in count 1. To resolve this dispute, we are tasked with determining what effect, if any, the One Strike law has on Granados's case.

Granados asks us to apply the reasoning offered in *People v. Turner* (2005) 134 Cal.App.4th 1591 (*Turner*) to conclude the One Strike law does not extend the statute of limitations here. In *Turner,* the defendant was convicted of multiple counts, including forcible oral copulation, forcible rape, aggravated assault, false imprisonment, kidnapping, residential robbery, and torture, against four different victims. (*Id.* at p. 1593.) Among other findings, the court found true allegations of seven prior convictions under the "Three Strikes" law (§ 1170.12), several prior serious felony convictions (§ 667, subd. (a)(1)), and a prior conviction under the "One Strike" law

14

(§ 667.61.)  (*Ibid.*)  The appellate court considered the effect of the Three Strikes law (§ 1170.12) on the statute of limitations for the residential robbery count.  (*Turner*, at p. 1595.)  The defendant argued that the statute of limitations could not be based on the sentencing outlined in the Three Strikes law because that law was based on his status as a recidivist.  (*Turner*, at p. 1596.)  He contended that the use of the word " 'offense' " in sections 799 and 805 meant the statute of limitations was extended only where the offense itself could result in a life sentence, not where facts other than the commission of the offense could do so.  (*Turner*, at p. 1596.)

Division One of the First Appellate District agreed, holding that the allegations of serious prior felony convictions did not constitute "an 'offense' " for which the defendant was prosecuted.  (*Turner*, *supra*, 134 Cal.App.4th at p. 1597.)  The appellate court reasoned that the prior convictions referred only to facts relevant to a particular offender, which simply established a defendant's status as a recidivist.  (*Id*. at pp. 1596-1599.)  And because the alternative punishment was imposed based upon the fact of recidivism, the sentence did not regard the seriousness of the current felony offense and therefore did not warrant application of section 799 to extend the statute of limitations.  (*Turner*, at p. 1600.)

Subsequent authority takes a different view.  In *People v. Perez* (2010) 182 Cal.App.4th 231 (*Perez*), the Sixth Appellate District considered whether the statute of limitations could be extended indefinitely pursuant to section 799 in the context of the One Strike law (§ 667.61).  (*Perez*, at pp. 239-240.)  There, a jury convicted the defendant of multiple counts of lewd and lascivious conduct under section 288 against multiple victims, with allegations under the One Strike law as to each count.  (*Perez*, at p. 234.)  *Perez* considered two Supreme Court cases that had been decided after

15

*Turner*, *People v. Jones* (2009) 47 Cal.4th 566 (*Jones*) and *People v. Brookfield* (2009) 47 Cal.4th 583 (*Brookfield*). *Jones* and *Brookfield* each regarded the interplay between section 186.22, targeting participants in criminal street gangs, and section 12022.53's penalty provisions. (*Jones,* at pp. 572-573; *Brookfield,* at pp. 591-592.)

In *Jones*, the Supreme Court asked if the life imprisonment punishment prescribed when an offense is found to be committed for the benefit of a criminal street gang made the offense punishable by death or life imprisonment, thus triggering a 20-year enhancement for use of a firearm and concluded it did. (*Jones, supra,* 47 Cal.4th at p. 569.) It reasoned that the sentencing provision there " 'set[ ] forth an alternate penalty *for the underlying felony itself*, when the jury ha[d] determined that the defendant ha[d] satisfied the conditions specified in the statute.' " (*Id.* at p. 578.) It contrasted that from an enhancement that provided for a term of prison in addition to the sentence for the underlying offense. (*Ibid*; *Brookfield, supra,* 47 Cal.4th at p. 591.)

In *Brookfield*, the high court likewise concluded that when a crime is committed to benefit a criminal street gang, the life sentence does not "constitute a sentence *enhancement*, because it is not imposed *in addition* to the sentence for the underlying crime . . . ; rather, it is an *alternate penalty* for that offense." (*Brookfield, supra,* 47 Cal.4th at p. 591.)

The *Perez* court considered the reasoning of *Turner* but concluded "Section 667.61 is an alternate penalty scheme that, when charged, defines the length of imprisonment for the substantive offense of violating section 288, subdivision (b)(1). Thus, the unlimited timeframe for prosecution set out in section 799 for an offense 'punishable by death or by imprisonment in the

16

state prison for life . . . ' " applies, given the life sentence required by the One Strike law because of the true findings on the multiple victim allegations. (*Perez*, *supra*, 182 Cal.App.4th at pp. 239-240.)

We find *Perez* persuasive and agree with the Sixth Appellate District that *Turner* "should be narrowly construed to apply only to the antirecidivist Three Strikes law, and not the One Strike law, which punishes, as relevant here, not recidivism but the commission of sexual offenses against more than one victim." (*Perez*, *supra*, 182 Cal.App.4th at p. 241; accord, *Anthony v. Superior Court* (2010) 188 Cal.App.4th 700, 717 [*Turner* must be limited to its facts because it "was entirely focused on the nexus between the statute of limitations scheme and the Three Strikes law"].)

We also note that *Turner* is distinguishable from *Perez* because *Turner* applied to an offender based on past criminal conduct, not on the particular circumstances attendant to the present offenses. (See *Turner*, *supra*, 134 Cal.App.4th at p. 1597.) Although the defendant there was convicted of crimes against multiple victims, the statute of limitations challenge regarded residential robbery to which the Three Strikes law applied, not lewd and lascivious acts to which the One Strike law applies. Here, Granados was convicted of victimizing multiple children. Thus, it is Granados's acts that expose him to the alternate penalty under the One Strike law.

Because the circumstances of the crimes alleged in counts 1 and 4 "were serious enough to earn [Granados] a life sentence [under the One Strike law,] they were serious enough to warrant prosecution at any time during his natural life." (*Perez*, *supra,* 182 Cal.App.4th at pp. 241-242.) Accordingly, count 1 was timely prosecuted.

## B. Ex Post Facto

Granados contends the applicability of the One Strike law (§ 667.61) is tied to whether or not he qualified for probation under former subdivision (c) of section 1203.066 and further contends he was presumptively eligible for probation in 1994. If he were eligible for probation in 1994 and 1995 when he committed the crimes against Elisa, he argues, the One Strike law would be inapplicable. Further, he contends it violates *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 to wait until 2019 to determine at sentencing whether the One Strike law applies because it increases the punishment possible without submitting the finding to a jury.

The maximum penalty for violating section 288, subdivision (a) depends on whether Granados "committed his offenses before or after the effective date of section 667.61." (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 260.) Section 667.61, the One Strike law, took effect November 30, 1994 (*Hiscox*, at p. 257), and it applies to violations of section 288 that occurred in late 1994 and 1995 (see *Hiscox*, at p. 257; *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1173-1174). Granados was charged for acts that occurred after the effective date of section 667.61. In 1994, section 667.61, subdivision (b)(7) applied to "[a] violation of subdivision (a) of section 288, unless the defendant qualifie[d] for probation under subdivision (c) of Section 1203.066." (Stats. 1994, ch. 447, § 1.)

At that time, section 1203.066 prohibited probation for 10 categories of sexual offenses, including violations of section 288, subdivision (a). (Amended Stats. 1993, ch. 587, § 1 [§§ 1203.066, subd. (a)(7) & (c)(1)-(4)]; see *People v. Jeffers* (1987) 43 Cal.3d 984, 987 (*Jeffers*).) Section 1203.066, subdivisions (a)(7) and (c) provided that "probation shall not be granted to . . . [¶] . . . [¶] [a] person who is convicted of committing a violation of Section 288

18

or 288.5 against more than one victim" except "when the court makes all of the following findings:  [¶]  (1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the household[; ¶]  (2)  A grant of probation to the defendant is in the best interest of the child[; ¶]  (3)  Rehabilitation of the defendant is feasible in a recognized treatment program designed to deal with child molestation, . . . [; ¶ and]  (4)  There is no threat of physical harm to the child victim if probation is granted."  (Amended Stats. 1993, ch. 587, § 1 [§§ 1203.066, subd. (a)(7) & (c)(1)-(4)].)  The statute also stated that the court was not precluded from sentencing the defendant to jail or prison upon making the required findings; it simply retained discretion to impose probation.  (*Id.*, subd. (c)(4); see *Jeffers*, at p. 987 [explaining probation could be an option for violating section 288, subd. (a) if imprisonment were not in child's best interest].)

A child victim's best interest is determined at the sentencing hearing, based on the child's best interest at the time of sentencing, not at the time of the criminal acts.  (*Jeffers*, *supra*, 43 Cal.3d at pp. 992, 999 [explaining legislative concerns regarding a child's best interest regard whether conditions exist at time of sentencing].)  But when a victim is no longer a child at the time of sentencing, a court cannot determine what is in the "best interest of the child" because there is no child.  (*People v. Wills* (2008) 160 Cal.App.4th 728, 737-738 (*Wills*).)  Thus, applying the version of section 667.61 in effect in 1994 and 1995, the time of the relevant crimes, the court properly considered whether Granados could be eligible for probation at the time of sentencing.  Because Elisa was not a child at the time of sentencing and the court has "no authority, and thus no legal discretion, to grant

probation . . . in a case in which the molestation victim is no longer a child at the time of sentencing" (see *Wills*, at p. 740), the court's imposition of indeterminate life sentences was not improper here.

Moreover, the delay between the time of the criminal acts and sentencing in this case did not increase the penalty for Granados. Even if Granados were eligible for probation under the terms detailed in section 667.61 in effect at the time of the crime, that would not have ensured a probation sentence rather than the prison term he received because probation is an act of clemency that requires a reduction to the sentence. (See *People v. Benitez* (2005) 127 Cal.App.4th 1274, 1278.) The statute expressly stated the court had discretion regarding probation; the court was not precluded from sentencing the defendant to jail or prison upon making the required findings (amended Stats. 1993, ch. 587, § 1 [§ 1203.066, subd. (c)(4)]). Because a court's decision not to grant probation, particularly where the law requires consideration of circumstances at the time of sentencing, does not increase the penalty available or criminalize conduct that was previously not criminal, the punishment here does not run afoul of ex post facto prohibitions.

### C. Challenges to Granados's Statements to Police

#### 1. Additional Facts

On February 8, 2019, the People filed a motion in limine to admit Granados's Spanish statements to Officer Ochoa, as translated. The motion contended that the officer was qualified to speak and interpret Spanish and that the officer had Mirandized Granados. At the hearing on the motions in limine, defense counsel agreed there was foundation for Officer Ochoa to use and interpret Spanish. When the court asked if there were any objections to the admission of the interview statements, defense counsel addressed the

officer's abilities, stating the defense would stipulate to Officer Ochoa's ability to speak Spanish. The court then announced it would dispense with the Evidence Code section 402 hearing and authorize the use of the defendant's statements. Defense counsel did not object to the admission of the statements.[4] Nor did defense counsel object to their admission at trial.

2. Voluntary waiver of *Miranda*

The prosecution bears the burden of proving by a preponderance of the evidence that a defendant has waived *Miranda* rights. (*People v. Linton* (2013) 56 Cal.4th 1146, 1171 (*Linton*); *People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*), quoting *People v. Dykes* (2009) 46 Cal.4th 731, 751.) Whether a *Miranda* waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances surrounding the interrogation. (*Williams*, at p. 425; *People v. Cruz* (2008) 44 Cal.4th 636, 668.) Thus, an evaluation of the voluntariness of the waiver "requires an evaluation of both the defendant's state of mind and circumstances surrounding the questioning." (*People v. Leon* (2020) 8 Cal.5th 831, 843.) We independently review the trial court's legal determination, and we rely on its findings on disputed facts as long as they are supported by substantial evidence. (*Williams*, *supra*, 49 Cal.4th at p. 425.)

Granados contends on appeal that Officer Ochoa "soften[ed him] up" before reading the *Miranda* warning, making the waiver involuntary. He further contends he may raise this issue for the first time on appeal because it is a legal question that relies on undisputed facts.

As the Supreme Court has explained, "The determination [of] whether a waiver is voluntary is one entrusted to the trial judge, based on the totality

---

4     There is no indication in the record before us that Granados filed any written opposition to the motion in limine.

of the facts and circumstances, including the background, experience and conduct of the accused." (*People v. Michaels* (2002) 28 Cal.4th 486, 512 (*Michaels*).) Here, because the parties did not develop the issues below, we lack information about how long the police spent at Granados's home and how much time elapsed between that conversation and the conversation at the police station where Granados was Mirandized. And Granados's failure to object to the use of his statements means the People did not have the opportunity to elicit information about Granados's background, experience, and conduct, or to respond to any attacks on the waiver. (*Id.* at p. 512.) Although Granados points to some undisputed facts, like his immigrant status and his limited criminal history, he likewise asks us to interpret the significance of these details. We decline to do so here, where the record is undeveloped on this point, and where Granados failed to object to the use of this information, thereby forfeiting the issue. (*People v. Ray* (1996) 13 Cal.4th 313, 339 (*Ray*); *Michaels*, at pp. 511-512.)

3. Voluntariness of Confession

Granados also argues his confession to Officer Ochoa, given after he was Mirandized, was the product of psychological pressure, making it involuntary. Granados explains that a confession is involuntary when elicited by an express or implied promise of benefit of leniency (*Ray*, *supra*, 13 Cal.4th at pp. 339-340) and notes Officer Ochoa repeatedly told him the officer wanted to help but needed Granados to tell the truth in order to do so. Granados also highlights the Reid Technique, which incorporates the use of false evidence to confront a defendant, and he alleges the police used this method, also making his statements involuntary.

An involuntary confession is predicated upon coercive police activity and is not admissible. (*People v. Maury* (2003) 30 Cal.4th 342, 404; *Linton*,

22

*supra*, 56 Cal.4th at p. 1176.) The test for voluntariness is "whether the defendant's 'will was overborne at the time he confessed.' " (*Maury*, at p. 404, quoting *Lynumn v. Illinois* (1963) 372 U.S. 528, 534.) Such a determination is based on the totality of the circumstances, including " ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Williams*, *supra*, 49 Cal.4th at p. 436; *Michaels*, *supra*, 28 Cal.4th at pp. 511-512.) But "no single factor is dispositive." (*Williams*, at p. 436.)

Granados failed to challenge the voluntariness of his statements and forfeited the challenge by not making a due process objection to the statements' admission in the trial court. (See *People v. Orozco* (2019) 32 Cal.App.5th 802, 818-819; see also *People v. Quiroz* (2013) 215 Cal.App.4th 65, 80.)

Granados maintains that when "the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the state then the police conduct renders the statement involuntary and inadmissible." (See *People v. Hall* (1967) 66 Cal.2d 536, 549.) But we lack information regarding whether Officer Ochoa's interaction with Granados would have been viewed as offering an implied benefit. Although Officer Ochoa commented that he wanted to "end this here" and let "everyone go home," he also told Granados that not remembering details of the events would not be an excuse for avoiding jail. And while Officer Ochoa told Granados he wanted to help Granados, he also said, "If there is a way I **can** . . . help you, I'll help you," and he offered to help Granados write an apology letter to Elisa. (Boldface added.) Further, when Granados asked Officer Ochoa what "help" would consist of,

commenting he thought it might mean sending him to a psychologist, Officer Ochoa responded that "help consists of knowing the truth" because lying would mean "getting in more trouble." From these comments and interactions, we simply cannot tell whether Granados felt coerced, as he suggests on appeal.

Further, Granados's comparison to *People v. Saldana* (2018) 19 Cal.App.5th 432 is not helpful. In *Saldana,* after describing interrogation techniques similar to the ones Granados complains of—the interrogator's belief the suspect is guilty, and offering the suspect a "moral justification and face-saving excuse[ ]" for his actions—the court noted that "[i]t is appropriate for police to use these interrogation techniques." (*Id.* at pp. 437-438.) The court found the interview in *Saldana* problematic because the defendant was questioned at the police station in what was tantamount to a custodial interrogation without first being advised of his *Miranda* rights. (*Id.* at p. 441.) But here, Granados was only questioned after he waived his *Miranda* rights. On this record, we cannot find Granados's confession was coerced or involuntary.

D. Ineffective Assistance of Counsel

Granados contends his attorney offered ineffective assistance of counsel by not seeking to exclude outright Granados's interrogation statements, not challenging the voluntariness of the confession, and because counsel did not seek to redact statements in the interrogation interviews during which Officer Ochoa repeatedly stated he believed the victims and accused Granados of penetration with Elisa.

To demonstrate ineffective assistance of counsel, Granados must demonstrate his trial attorney's performance (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) the

24

deficient performance prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) We evaluate the attorney's conduct with deference and we "indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) "Counsel's failure to make a futile or unmeritorious objection is not deficient performance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092, citing *People v. Price* (1991) 1 Cal.4th 324, 387.)

Further, " ' "[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*); *People v. Cash* (2002) 28 Cal.4th 703, 734 (*Cash*) [" ' " 'record must affirmatively disclose the lack of rational tactical purpose for challenged act or omission.' [Citation.]" ' [Citation.]"].) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*Mendoza Tello*, at pp. 266-267.)

For each of the alleged errors, Granados maintains that his attorney should have sought exclusion of the interrogation statements or redaction of some portion of them. But there were tactical reasons to admit the entirety of the interviews. For example, Granados told Officer Ochoa that Elisa was at least 14 years old, negating an element of count 1 that required the victim to be under age 14. Granados's attorney urged acquittal on count 1 for that reason.

Similarly, Granados's counsel may not have objected to the admission of the entire interrogation interview sequence because it highlighted how frequently Officer Ochoa was lying to Granados and how steadfast Granados

25

was in his denial of some of the accusations. Granados's consistent denials may have established credibility in his favor, where the repeated lies may have reduced the esteem of the officer in the eyes of the jury.

Moreover, when Officer Ochoa told Granados that his story did not match the specific details provided by victims, Granados seemed puzzled, commenting he would like more information from the victims directly because he did not hold the same memories. His attorney may have opted to include these details because it showed Granados did not react defensively, and that may have tended to show he was more credible when he denied the allegations in counts 2 and 3, for which he was acquitted. His denials regarding the allegations of penetration in the face of repeated accusations likewise may have elevated his credibility and impacted the jury's decisions on other counts.

We cannot say the failure to object to the admission of some or all of the interrogation evinces ineffective assistance of counsel. Absent some declaration or other information for defense counsel's decision not to challenge the admission of the full interview, we must reject this argument on appeal. (*Mendoza Tello*, *supra*, 15 Cal.4th at p. 266, *Cash*, *supra*, 28 Cal.4th at p. 734.)

### E. Evidence of Uncharged Crimes

#### 1. Additional Facts

The People proposed a line of questions to establish the events in the charged count occurred when Elisa was 13 years old, and that Granados would touch her under her underwear as she slept or prepared to sleep. The People also sought to ask additional questions regarding uncharged conduct that would help establish Elisa's age when Granados's behavior began. The prosecutor explained that she would limit the testimony to focus on when the

26

touching started, not straying into the later teen years or the length of the abuse, because it was consistent with the age other victims would testify to regarding the ages at which Granados began molesting them.

Defense counsel argued the evidence of uncharged conduct would be highly prejudicial and confusing. When pressed about what made the evidence unduly prejudicial, defense counsel argued "the sheer nature" of the testimony would outweigh the probative value and preclude an opportunity to defend the facts of the case. He argued the allegations were vague and lacked material that would aid the jury in evaluating the facts of the case, causing confusion and prejudice.

The court concluded that the evidence proposed tended to show propensity, and it would allow the testimony with the limitations outlined by the People.

The court instructed the jury with CALCRIM No. 1191A[5]:

> "The People presented evidence that the defendant committed the crime of Lewd and Lascivious Act on A Child Under the Age of 14 years that was not charged in this case. . . .

> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

> "If the People have not met this burden of proof, you must disregard this evidence entirely.

---

[5]    CALCRIM No. 1191A contains the same language as former CALCRIM No. 1191. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1 (*Gonzales*).)

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit, as charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charge. The People must still prove the charge beyond a reasonable doubt."

The People referenced the jury instruction during closing arguments, explaining that CALCRIM No. 1191A addresses uncharged conduct, and in this case it looked at whether Elisa's testimony of the timing of the molestation for which Granados was not charged was credible, and if so, whether it contributed to demonstrating a pattern of molesting girls under age 14. The prosecutor explained that if the jury believed Granados touched Elisa when she was 10 years old based on a preponderance of the evidence, it could conclude that he was disposed or inclined to commit those sexual offenses and use that as a factor in determining whether he committed the crimes for which he was charged. She argued that it was only one factor to consider, and convictions could not be based on that factor alone. The People also explained that the ultimate standard for whether they proved their case was proof beyond a reasonable doubt.

2. CALCRIM No. 1191A

Granados acknowledges he did not object to the use of CALCRIM No. 1191A, which would typically result in forfeiture of the issue on appeal. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 471; *People v. Bolin* (1998) 18 Cal.4th 297, 326.) However, he contends the instructional error affected substantial rights because its use was prejudicial, and so no objection was necessary to preserve his claim. (*People v. Hudson* (2006) 38 Cal.4th 1002,

28

1012 [concluding no objection required if instruction is incorrect statement of law]; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [reviewing claim of instructional error based on argument the alleged error affected substantial rights].)  We review a claim of instructional error de novo.  (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1089.)

Granados contends CALCRIM No. 1191A should only be given if the evidence of uncharged sexual misconduct comes from third parties, and not one of the victims herself.  The theory is that when a victim-witness proffers evidence of an uncharged crime, it allows proof of an ultimate fact by a preponderance of the evidence rather than by reasonable doubt.  Thus, he contends the use of CALCRIM No. 1191A created confusion.

However, "[n]othing in [Evidence Code] section 1108 limits its effect to the testimony of third parties.  Instead, the statute allows the admission of evidence of uncharged sexual offenses from any witness subject to [Evidence Code] section 352."  (*Gonzales, supra*, 16 Cal.App.5th at p. 502.)  Further, as the court explained in *Gonzales* at page 502, CALCRIM No. 1191 "also instructs that the uncharged offenses are only one factor to consider"; that such testimony is "not sufficient to prove by [itself] that the defendant is guilty of the charged offenses; and . . . the People must still prove the charged offenses beyond a reasonable doubt."  (See also *People v. Reliford* (2003) 29 Cal.4th 1007, 1011-1016 (*Reliford*) [rejecting similar challenge to predecessor jury instruction CALJIC No. 2.50.01].)  In other words, the use of the instruction does not reduce the People's burden of proof or incorrectly state the law.

Count 1 alleged Granados violated section 288, subdivision (a) because Elisa was under age 14 at the time of charged acts.  Elisa testified that she had been Granados's victim long before that, as early as age 10.  The

prosecutor used this information, which related to an uncharged crime, to argue Granados had a pattern of and propensity for molesting girls under age 14. Although the evidence here supported count 1, which charged Granados with lewd and lascivious conduct against Elisa when she was under age 14, the prosecution did not focus its argument there. Instead, it asked the jury to conclude the People proved by a preponderance of the evidence that Elisa was molested when she was 10 years old and to take that conclusion into consideration when evaluating more broadly whether he committed other offenses. The prosecutor did not direct the jury to consider the testimony regarding the uncharged crimes to support any particular count, and Granados does not argue the instruction was improper with respect to counts 2, 3, or 4.

Moreover, the People clearly explained how the burden of proof detailed in CALCRIM No. 1191A regarding the uncharged crime functioned, and they stated such a finding could not be the sole reason for a guilty verdict. The evidence regarding uncharged crimes related to Elisa's age, and the prosecutor utilized the information to support the argument that Granados had a pattern of molesting girls under the age of 14. It was not error to offer this instruction.

3. Evidence Code Sections 352 and 1108

Although Granados did not object to the use of CALCRIM No. 1191A, he did oppose a motion to admit the evidence of the prior uncharged crimes against Elisa pursuant to Evidence Code section 1108, arguing the inclusion of such evidence was highly prejudicial and would confuse the jury. He claims the prior crimes evidence was generic and thus held no probative value to demonstrate propensity.

30

Evidence Code Section 1108 allows the admission of uncharged sexual acts to show the defendant's propensity to commit sexual offenses. This section is a significant departure from the general rule that evidence of propensity to commit a crime is not admissible. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1160.) The admissibility of such evidence depends on the trial court's review of the proposed testimony in light of Evidence Code section 352, weighing its probative value against its prejudicial effect. (*People v. Loy* (2011) 52 Cal.4th 46, 61-62 (*Loy*); *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*); *Reliford*, *supra*, 29 Cal.4th at p. 1012; *Gonzales*, *supra*, 16 Cal.App.5th at p. 502.)

In deciding whether to admit sex-act evidence, courts consider a number of factors identified in case law, including the nature of the acts, the relevance to current issues, remoteness, degree of certainty of commission, the likelihood of misleading or confusing jurors or distracting them from the principal inquiry regarding the charged offenses, the similarity of the acts to the current offenses, potential prejudicial impact on jurors, the burden on the defendant's ability to defend, and the availability of less prejudicial alternatives to the admission of the sex offense evidence. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) We review the admissibility of Evidence Code section 1108 evidence for an abuse of discretion, and we will not overturn such a decision absent a clear showing the trial court's actions were unreasonable or arbitrary. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286; *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

Here, the court permitted Elisa to testify that Granados's molestation began around age 10 or 11. The testimony about her age when the abuse began was relevant because it helped demonstrate a pattern of behavior and Granados's propensity toward molesting young girls. Granados does not

31

argue otherwise. Instead, he contends it was error to admit the evidence because it lacked any probative value, since she simply "repeat[ed] the claim that the same generic events happened before she was 13." In essence, he maintains that the testimony was too vague to be relevant. Elisa testified that she moved to Calaveras Street when she was around 10 and a half or 11 years old, and that's when the molestation began. Thus, the testimony was specific about the age at which the touching began, which was its primary purpose. The lack of testimony about the details of what specific touching occurred on which dates does not make the probative nature of the evidence, which regarded Elisa's age at the time of the molestation began, irrelevant.

Granados does not explain why the probative value is outweighed by any prejudice resulting from the testimony. Nor does he explain why the jury would be confused to hear that Granados touched Elisa starting around age 10 and a half, but he was only charged with conduct that occurred when Elisa was older. In short, Granados does not seriously challenge the reasonableness of the court's decision to admit the evidence. We, likewise, cannot find the court abused its discretion here.

Granados separately argues the evidence was highly prejudicial because it allowed the jury to evaluate its truthfulness under a preponderance standard that lowered the prosecution's burden on the issue of Elisa's credibility. As we detailed *ante*, this is simply not so. The admission of evidence under Evidence Code section 1108 does not affect the ultimate burden of proof at trial. (See, e.g., *Reliford, supra*, 29 Cal.4th at pp. 1011-1016.)

4. Due Process Claim

Granados invites us to reexamine the legal premises for admitting evidence of uncharged sexual offenses, contending it violates state and federal Constitutions. As Granados recognizes, our Supreme Court has concluded Evidence Code section 352 saves Evidence Code section 1108 from a due process challenge. (*Falsetta, supra*, 21 Cal.4th at p. 917.) Further, when asked to reconsider the holding in *Falsetta*, our high court found no good reason to do so. (*Loy, supra*, 52 Cal.4th at pp. 60-61 [adhering to *Falsetta* and noting the Ninth Circuit held similar federal rule to be constitutional].) We are bound by the opinions of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

F. Attempt Instruction

Granados contends the court erred by failing sua sponte to offer instructions for the lesser-included offense of attempted lewd and lascivious acts on a child under section 288, subdivision (a). We review the failure to instruct on an uncharged, lesser-included offense de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).)

Courts must instruct on a lesser-included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Substantial evidence is evidence from which a reasonable jury could conclude the defendant committed the lesser offense but not the greater offense. (*Ibid*.) " ' "[W]]hen there was no evidence that the offense was less than that charged," ' " the court is relieved of its duty to instruct the jury on the lesser-included offense. (*People v. Valdez* (2004) 32 Cal.4th 73, 115.)

In general, "an attempt to commit a crime is a lesser included offense of the completed crime." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 156.)

Attempt can be distinguished from the substantive offense by the failure to complete the act, but the elements of the attempted offense are otherwise included in the greater offenses. (*Ibid*.) A defendant violates section 288, subdivision (a) when he "willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child. . . ." To demonstrate an attempted violation of section 288, subdivision (a), the People must show the defendant intended to commit a lewd or lascivious act with a child under age 14, and "the defendant took a direct but ineffectual step toward committing a lewd and lascivious act with a child under 14 years of age." (*People v. Singh* (2011) 198 Cal.App.4th 364, 368 (*Singh*).)

"Section 288, subdivision (a), requires a touching, even one *innocuous or inoffensive* on its face, done with lewd intent." (*People v. Lopez* (1998) 19 Cal.4th 282, 290 (*Lopez*).) Courts have concluded that "a lewdly intended embrace innocently and warmly received by a child" may violate section 288. (*Lopez*, at pp. 290-291.) And "the absence of an innocent explanation" to justify the manner of the touching itself may demonstrate the act was "committed for a sexual purpose." (*People v. Martinez* (1995) 11 Cal.4th 434, 452 (*Martinez*).)

Granados contends evidence supports an attempt charge because he told authorities that once, while hugging Elisa when she was 14 or 15, he tried to move his hand to her buttocks over her clothing, but she moved it away, showing he did not complete the touching. Even if we reach the conclusion that Granados never touched Elisa's buttocks with his hands, that is not sufficient here to require an instruction on the lesser-included charge because it ignores the remaining facts surrounding the incident(s).

34

Granados's statements to Officer Ochoa disclosed that he slid his hand down Elisa's back under her clothing and tried to touch her buttocks before she pulled his hand out. His statements also revealed he hugged Elisa in a way that was not a normal hug, during which he "lost [his] head," but did not "have relations" with her. He explained he felt horny when he hugged Elisa, that he developed an erection, and that he believed Elisa also felt the erection. He suggested he thought she might enjoy it, explaining "[I]f she doesn't say anything, well, one want[s] to slide the hands down or touch something." Further, he revealed that he realized he had made a mistake, and he regretted it.

He admitted he developed an erection because he felt horny, and he moved his hand toward Elisa's buttocks because he thought she might be interested. This admission shows lewd intent; his actions appealed to his own lust and his (inaccurate) perception of Elisa's lust, and it demonstrates his actions were not innocent. (See § 288, subd. (a); see also *Martinez, supra,* 11 Cal.4th at p. 452.) Further, his explanation that in retrospect he regretted it, he "lost [his] head," and that he never acted that way again because he knew it was a mistake indicates he understood the lewd intent with which he behaved was improper. The hug itself shows his actions were not "ineffectual."[6] (See *Singh, supra,* 198 Cal.App.4th at p. 368.) And even if a hug could seem innocuous or inoffensive on its face, because it was done with lewd intent, he violated section 288. (*Lopez, supra,* 19 Cal.4th at p. 290.) Accordingly, the court's failure to sua sponte offer an instruction on a lesser-included attempt charge was not an abuse of discretion.

---

[6] Elisa's testimony provided evidence of additional lewd acts against her when she was under age 14. However, we focus on the behavior in which Granados admitted he engaged to demonstrate why an attempt instruction was not required.

## G.  Fresh Complaint Testimony

### 1.  Additional Facts

The People moved in limine to admit Alyson's statements to Paloma as a fresh complaint.  The People argued the information was relevant and corroborated information in a police report drafted by Officer Ochoa, explaining Karina contacted the police department based on information she had received from Paloma.

The People argued the nature and circumstances of Alyson's disclosure to Paloma were relevant because it showed when something was recorded, and because it demonstrated Alyson's testimony was consistent with her complaint, and it showed that she understood the difference between fantasy and reality.  Further, Alyson reported what happened to Paloma, not to her mother.  And Paloma's information about how the information came to her could show why Alyson did not report Granados's behavior sooner.  Paloma was the first person Alyson told about being touched by Granados, information that came out while Alyson was in Paloma's care.

Defense counsel argued the fresh complaint was unnecessarily bolstering because the same information would be shared by the forensic interviewer, and there were plenty of reasons to explain why a seven-year-old might have memory lapses.

The court asked defense counsel to confirm the forensic interview included the information about how the information was shared with Paloma.  Defense said it was looking, and the court tentatively allowed the fresh complaint.  Both the prosecutor and defense counsel later confirmed there was no clear reference to Alyson revealing her experiences with Granados to Paloma in the forensic interview.

2. Legal Principles

The fresh complaint doctrine permits "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault" to be admitted "for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) The evidence may be used to corroborate the victim's testimony, but it may not be used to prove the crime occurred. (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.) Testimony surrounding the complaint should be "limited to the fact of the making of the complaint and other circumstances material to this limited purpose." (*Brown*, at p. 763.) We review the admissibility of this evidence for an abuse of discretion. (*Waidla*, *supra*, 22 Cal.4th at p. 723.)

Granados appeals the admission of Paloma's testimony, not on the basis that admitting fresh complaint evidence was improper to show that Alyson reported the touching to her aunt, but on the basis that the content of the testimony was so detailed that it violated his due process rights. He essentially contends the testimony was inadmissible hearsay.

3. Forfeiture

A motion in limine can preserve a challenge to the admission of evidence for appeal (see Evid. Code, § 353) without an objection being renewed at the time of testimony when the motion makes a specific objection, is "directed to an identifiable body of evidence," and is "advanced at a time when the trial judge could give fair consideration to the admissibility of the evidence in its context." (*People v. Morris* (1991) 53 Cal.3d 152, 189 (*Morris*).)

37

However, a motion in limine does not meet these requirements when the evidence that is the subject of the motion is difficult to specify until the evidence is offered. (*Id.* at pp. 189-190.) In those circumstances, "an objection at the time the evidence is offered serves to focus the issue and protect the record." (*Id.* at p. 190.) Accordingly, a motion in limine protects the record on appeal when it specifies a legal ground for exclusion that is the same ground subsequently raised on appeal, is directed to a particular, identifiable body of evidence, and is made at a time when the judge can determine the evidentiary value of the evidence in context. (*Ibid.*) But "if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*Morris*, at p. 190.)

Defense counsel failed to object to the substance of the testimony that Granados now contends went beyond the confines of what information is permissible for a fresh complaint. Granados did not file a motion in limine seeking to exclude such evidence, and he did not object to the introduction of the evidence at trial. In his response to the People's motion in limine to include Paloma's fresh complaint testimony, Granados's attorney opposed the evidence on the ground that it would improperly bolster Alyson's testimony, based on his belief that the same information would be provided by the forensic interview. But he later confirmed that the same information was not included in Alyson's forensic interview, and he did not object to the introduction of the evidence on any other basis at that time. Thus, the motion in limine does not preserve this issue on appeal because the legal ground for exclusion raised at the hearing (improper bolstering through redundant evidence) is not the same challenge Granados makes on appeal. (See *Morris*, *supra*, 53 Cal.3d at p. 190.)

Even had defense counsel properly preserved the issue for appeal, we would find no abuse of discretion here. Contrary to Granados's claim that Paloma's testimony "went well beyond the admissible boundaries of fresh complaint evidence" because it included specific details, Paloma's testimony only revealed that Alyson told her that Granados had touched her private parts over and underneath her clothing. It did not disclose the details of Granados licking her or touching her buttocks with his hand. It did not detail when the molestation took place, when it began, or how frequently it occurred. This testimony described information relevant to explain why Paloma shared the information with Karina and why Alyson did not come forward sooner.

Further, even had the court erred in admitting the testimony, it did not result in prejudice. Granados contends the evidence violated due process because Paloma's retelling of Granados's acts improperly bolstered Alyson's credibility. But Alyson's interview with Limon was played at trial and Alyson herself testified at trial. The jury did not need to rely on secondhand statements because it was able to consider Alyson's credibility directly.

Finally, we are not persuaded by Granados's contention that the failure to object to the testimony or request a limiting instruction constituted ineffective assistance of counsel. We lack any information regarding defense counsel's rationale for failing to object to Paloma's testimony or for failing to seek a limiting instruction. Perhaps defense counsel decided not to object because he believed the information was not improper under fresh complaint doctrine, the conclusion we drew *ante*. Perhaps he failed to object or seek a limiting instruction because he believed it would emphasize Paloma's

39

testimony. Whatever defense counsel's reasoning was, the record does not reflect it; thus, this issue is more appropriately reviewed on habeas corpus petition. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

## H. Cumulative Error

Granados argues that even if no single error were prejudicial in its own right, their combined effect was to lower the burden of proof and strengthen the People's case, establishing cumulative error. Having determined the court here did not commit any errors, there is likewise no cumulative, prejudicial error. (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1053-1054 [no cumulative effect of error when no error]; see *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1246 ["Since there is no error in these individual rulings, there is, of course, no cumulative error"].)

## DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

40